# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ADAM R. KLAHN,

         Plaintiff,

    v.                                  Case No.   13-C-165

CAROLYN W. COLVIN,
Commissioner of Social Security,

         Defendant.

## DECISION AND ORDER

This is an action for review of the final decision of the Commissioner of Social Security denying Plaintiff Adam R. Klahn's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("Act"), 42 U.S.C. § 401 *et seq*. For the reasons given below, the decision of the Commissioner will be affirmed.

## I. Background

Klahn holds a graduate degree and has studied electronics, business management, and computer information systems. (Tr. 79-80.) He began his career as an engineer for the U.S. government, transitioned to the U.S. Army Signal Corps in 1996, and then worked for the Military Intelligence Corps from approximately 1999 to 2003. (Tr. 80-83.) Klahn was a classroom instructor and his specialty was electronic warfare and intercept systems repair. (Tr. 80.) In March 2003, Klahn received a medical discharge from the military because he had injured his back and was no longer able to lift 30 pounds, as the military required. (Tr. 80-81.) Klahn briefly attempted to

work in the forestry industry after being discharged from the military but contends that his back pain prevented him from continuing in the position. (Tr. 52.) Klahn has not been employed since 2004. (Tr. 291-92.)

Klahn filed an application on May 17, 2010, alleging disability beginning January 1, 2004, due to chronic back pain, hearing loss, arthritis, trigeminal neuralgia, hyperlipidemia, gastroesophageal reflux disease, and bipolar disorder. (Tr. 25.) At the time of his alleged onset date, Klahn was forty-one years old. (Tr. 37.) His application was denied initially and on reconsideration, and he requested a hearing. (Tr. 137, 148.) On September 15, 2011, a hearing was held before Administrative Law Judge (ALJ) John H. Pleuss at which Klahn, represented by counsel, and a vocational expert (VE) testified. (Tr. 48-74.)

Klahn testified he was given an 80% disability rating from the military upon his discharge in 2003, based primarily on his lower back pain. (Tr. 52-53.) He reported that back pain was still his primary problem and that if he had to sit or stand for too long, he would experience lower back pain and shooting pains down his legs. (Tr. 53.) He estimated that he might be able to sit or stand for 4-5 hours in a day but would struggle to do so five days a week. (Tr. 56.) Klahn also explained that he had taken antidepressants while on active duty in the military, and shortly after his discharge, he also started taking medications for bipolar disorder and anxiety. (Tr. 53.) He noted that the antidepressants made him very sleepy. (*Id.*) Klahn's attorney asked if he had any "psychosis," and Klahn responded that he had an occasional, mild psychosis. (*Id.*) He reported having visual hallucinations in which "shadow" figures would appear as well as audio hallucinations. (Tr. 54.) Klahn stated that when he discussed these symptoms with his psychiatrist, the psychiatrist increased his medications and he became more sleepy and dysfunctional. (Tr. 54.) When asked what

2

depresses him, Klahn stated that he does not understand how anyone could not be depressed when they look at what is going on in the world and the future of the human race. (Tr. 59.) Finally, Klahn described a 2006 automobile accident in which he was cited for driving under the influence of alcohol. (Tr. 60.) Klahn explained that although his car was crushed like an accordion, he miraculously survived with minimal injuries. (Tr. 60-61.) He claimed that he gave up drinking after the accident. (Tr. 60.)

Klahn's "last insured" date is March 31, 2009, and therefore he was only eligible to receive DIB if the ALJ found that he had become disabled prior to this date. (Tr. 23.) The period from January 1, 2004, his alleged onset date, to March 31, 2009 is therefore the relevant period under review. On October 3, 2011, the ALJ found that Klahn was unable to perform his past relevant work but was not disabled as of his date last insured because he could perform other jobs that existed in significant numbers in the national economy. (Tr. 121.) At steps two and three of the sequential analysis, the ALJ found that Klahn had severe impairments of hearing loss, arthritis, chronic low back pain, and bipolar disorder but did not meet a listing. (Tr. 113.) He also found that Klahn exhibited mild restrictions in activities of daily living, mild difficulties in social functioning, and moderate difficulties in concentration, persistence, or pace. (Tr. 116.) At step four of the sequential process, the ALJ must determine the individual's residual functional capacity (RFC), or "what an individual can still do despite his or her limitations." S.S.R. 96–8p. The RFC represents the maximum a person can do, despite his limitations, on a "regular and continuing basis," which means roughly eight hours a day for five days a week. *Pepper v. Colvin,* 712 F.3d 351, 362 (7th Cir. 2013). Klahn's RFC indicated that among other limitations, he could perform less than the full range of medium work and had a "limited but satisfactory ability to maintain attention and

3

concentration, demonstrate reliability in time and attendance, and complete a normal workday and workweek without interruptions from psychologically based symptoms or unreasonable rest periods." (Tr. 116.) In his opinion, the ALJ explained that no treating source had provided an assessment of Klahn's residual functional capacity, but he gave significant weight to the opinions of state agency physicians Pat Chan, M.D. ,and Esther Lefevre, Ph.D. (Tr. 120.) Based on Klahn's RFC and the testimony of the VE, the ALJ found Klahn could perform a variety of jobs requiring medium or light work and was therefore not disabled. (Tr. 122.)

Klahn appealed, and the Appeals Council ordered remand to the ALJ on January 27, 2012, based on error of law and new evidence. (Tr. 130-32.) The Appeals Council directed the ALJ to do the following:

> Evaluate the Department of Veterans Affairs disability rating of eighty percent and explain the weight given to that determination, consider new medical opinion evidence submitted after the prior decision was issued, obtain additional medical evidence if warranted, give further consideration to treating source opinions, give further consideration to the claimant's residual functional capacity in light of new evidence, and take additional vocational expert testimony if warranted.

(Tr. 22, 130-132.) The ALJ conducted a *de novo* hearing on July 19, 2012, at which Klahn gave additional testimony and a VE testified. (Tr. 75-104.) Klahn testified that he suffered from degenerative disc disease and that he could not sit for more than one to two hours before his back would need to be adjusted. (Tr. 85-87.) When asked why he is unable to work, Klahn testified that he had a hard time dealing with others and would not be able to maintain a job that required even occasional contact with coworkers and supervisors. (Tr. 89.) He explained that he "would have a really hard time with [] the rat race, the competition, the internal politics, the fatalness of it all," and that he survived by avoiding contact with others. (*Id.*) Regarding his mental limitations, Klahn

4

reported that he had difficulty "focusing," including a difficulty believing that the current date is accurate. (Tr. 90-91.) He stated that he knew it was not supposed to be July 19, 2012, and that it had not been ten years for him since he was discharged from the Army, although he acknowledged that it had been ten "linear years." (*Id.*)

The ALJ subsequently issued an opinion on September 7, 2012, again finding Klahn not disabled during the relevant period. (Tr. 22-38.) Following the instructions of the Appeals Council, the ALJ evaluated the opinion submitted by treating physician Dr. Stuart Greene, M.D., and assessed the weight he afforded the disability ratings assigned to Klahn by the Department of Veterans Affairs. (Tr. 34-36.) The ALJ afforded little weight to these opinions and gave greater weight to the state agency physicians. (*Id.*) At steps two and three of the sequential analysis, the ALJ again found that Klahn had severe impairments of hearing loss, arthritis, chronic low back pain, and bipolar disorder but did not meet a listing. (Tr. 25.) He again found that Klahn exhibited mild restrictions in activities of daily living and moderate difficulties in concentration, persistence, or pace, but differing from his earlier opinion, he found that Klahn had moderate rather than mild difficulties in social functioning. (Tr. 27.) The ALJ's RFC finding indicated that among other limitations, Klahn could perform less than the full range of medium work, was "limited to only occasional contact with supervisors, co-workers, and the general public," and was "likely to be off task about five percent of the workday in addition to regularly scheduled breaks." (Tr. 28.) Based on this RFC and the VE's testimony, the ALJ again found that Klahn was unable to perform his past relevant work but was not disabled as of his date last insured because he could perform other jobs that existed in significant numbers in the national economy. (Tr. 37-38.) Specifically, the ALJ found that Klahn could work as an office helper, food preparer, dishwasher, bench assembler, or

5

sorter. (Tr. 38.) The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. Analysis

An ALJ's conclusion of no disability is reviewed with deference and will be upheld if it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and his conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ must also "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.*

If the only issue before this court was whether the Commissioner's decision was supported by substantial evidence, the outcome would be clear. For the record contains substantial evidence that Klahn was not disabled, within the meaning of the Act in the relevant period. For example, though he claims he was unable to work because of severe back pain, the record discloses no

6

treatment beyond pain medication, physical therapy and chiropractic manipulation. The massive record he has compiled with the Iron Mountain Veteran Administration Clinic (VAMC) appears to begin when he relocated to Wisconsin from Arizona in late 2003 or 2004. He presented at the VAMC on February 18, 2004, voicing no complaints, but simply because he wanted to become familiar with the VA system here. (Tr. 434.) Though his medical records from Southern Arizona Veteran's Hospital had not yet arrived (and still seem to be missing), Klahn reported a medical history that was significant for chronic low back pain. He stated he sustained an injury in the army and was told he had a herniated disc. According to Klahn he had failed a trial of physical therapy along with traction, and at one point was on oral narcotics from which he had weaned himself. He said he was presently on Tegretol with good management of his symptoms but indicated he was open to trying a physical therapy regimen again in the future. (Tr. 434, 467.)

X-rays taken at the VAMC in August 2006, however, showed an "unremarkable lumbar spine series." (Tr. 757.) A repeat of the X-rays the following month showed "mild focal posterior intervertebral disc space narrowing at L4-5, which is probably responsible for minimal retrolisthesis of L4 on L5." (Tr. 753.) There was no mention of any herniated disc, though a Rating Decision of the Phoenix Regional Office of the VA dated July 31, 2003, references "evaluation of degenerative joint disease, L4-L5, L5-S1 with herniated nucleus pulposus, L4-L5 (also claimed as thoracic spine), which is currently 20 percent disabling." (Tr. 1496.)

Moreover, despite Klahn's claim that he was unable to work because of his chronic lower back pain, the records from his chiropractor indicate that he frequently came in for treatment throughout 2007 to 2010 after he had aggravated his back by engaging in activities such as gardening (Tr. 824, 843, 877), hiking (Tr. 844), cutting and carrying firewood (Tr. 832, 833, 842,

7

849, 850, 851, 853, 855, 862, 863, 864, 869, 872, 873), shoveling snow (Tr. 834, 837, 838), digging a trench (Tr. 840), and even roofing (Tr. 875). These are not activities one who suffers from chronic and disabling back pain normally undertakes.

Not surprisingly, Dr. Pat Chan, a state agency consulting physician who completed a Physical Residual Functional Capacity Assessment on September 22, 2010, based on her review of the record, found that Klahn had no exertional or postural limitations or other physical limitations with the exception of a hearing loss that was significantly improved with new hearing aids. (Tr. 885-892.) Dr. Chan's assessment was confirmed on March 8, 2011, by Dr. Janis Byrd, who likewise found no severe limitation of Klahn's physical activities between his alleged onset date of January 1, 2004, and his last insured date of March 31, 2009. (Tr. 1408.)

Substantial evidence in the record also supports the ALJ's finding that Klahn did not have a disabling mental impairment. Although Klahn was diagnosed with bipolar disorder, the record suggested it was well controlled with medication. Dr. Esther Lefevre, a state agency consulting psychologist, completed a Mental Residual Functional Capacity Assessment on September 24, 2009, based on her review of the record and concluded that Klahn's symptoms were not markedly limiting and he was capable of simple, routine work throughout the period from his alleged onset date to his date last insured. (Tr. 893-96.) Dr. Lefevre's opinion was confirmed on March 8, 2011, by Dr. Deborah Pape, who noted from her review of the record that Klahn was doing well with psychiatric treatment and medication. Dr. Pape concluded that "[t]he evidence does not show the inability to do unskilled work through his date last insured . . . ." (Tr. 1409.)

By any measure, this constitutes substantial evidence that supports the ALJ's finding that Klahn had an RFC to perform a limited range of medium work. But as in most Social Security

disability cases that come before the courts, the question is not whether substantial evidence supports the Commissioner's decision, but whether the ALJ followed the rules and regulations of the Social Security Administration (SSA). The SSA has promulgated an intricate and complex set of regulations and rulings that are intended to guide the ALJs in analyzing disability claims. In order to affirm the Commissioner's decision, the court must find not only that it is supported by substantial evidence, but also that "the ALJ applied the correct legal standards." *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Absent a finding that the error is harmless, an ALJ's failure to follow a regulation or ruling requires that the case be remanded. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Klahn argues here that the ALJ did not comply with the SSA's own rulings and regulations and that the Commissioner's decision must, therefore, be reversed and remanded.

Klahn contends that the ALJ erred in three respects. He contends that (1) the ALJ failed to follow the treating physician rule when he discounted the opinion presented by psychiatrist Stuart Greene; (2) the ALJ's credibility determination is not supported by substantial evidence; and (3) the ALJ erred by failing to incorporate all of Klahn's material limitations into the hypothetical posed to the VE and the RFC determination. (Pl.'s Br. at 10, ECF No. 9.) Each will be addressed in turn.

### A. Treating Physician Rule

Klahn contends that the ALJ violated the "treating physician rule," which requires the Agency to give controlling weight to the opinion of a claimant's treating physician if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The reason for giving greater weight to the opinions of treating physicians is that they "are likely to be the medical professionals most

9

able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).

At the same time, "a claimant is not entitled to disability benefits simply because his physician states that he is 'disabled' or unable to work." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Seventh Circuit has cautioned that treating physicians may bring their own biases to the evaluation. *See id.* ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). Thus, the ALJ need not blindly accept a treating physician's opinion—he may discount it if it is internally inconsistent or contradicted by other substantial medical evidence in the record. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). If the ALJ discounts a treating physician's opinion, he must then determine what weight to give the opinion using the factors listed in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including the length of treatment, the physician's specialty, and the consistency and supportability of the opinion. *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009); *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008). While the ALJ must use these factors to provide some explanation for his decision to discount a treating physician's opinion, federal court review is deferential: the ALJ's decision must stand as long as he has "minimally articulated" his reasons for rejecting the treating physician's opinion. *Elder*, 529 F.3d at 415.

Klahn contends that the ALJ erred by declining to give controlling weight to the narrative opinion of Dr. Stuart Greene, Klahn's treating psychiatrist beginning in February 2009. Dr. Greene

10

drafted a letter on December 20, 2011, after reviewing Klahn's medical record dating back to at least 2004. His narrative provided in relevant part:

> [T]his individual is a chronically ill person with a profound and disabling mental illness who had become too dysfunctional to maintain the continuity of contact needed to engage in any meaningful employment. He is not capable of problem-solving normal workplace interactions without regressing significantly. Historically, this regression has resulted in a level of deterioration which has included physical aggression towards others, possible suicidal states and further psychotic episodes. His prognosis is very poor for recovery since the illness has interfered with his functional capacity since childhood, and has evolved into a chronic delusional state over at least the past seven years as documented consistently in the medical record by at least three separate Psychiatrists.

(Tr. 33-34, 1413-14.) The ALJ gave Dr. Greene's narrative opinion "little weight" for four reasons: (1) Dr. Greene started treating Klahn only one month prior to the expiration of his insured status; (2) Dr. Greene's opinion was inconsistent with the notes of Dr. Bales, Klahn's treating physician during the relevant period, and his conclusions lacked foundation in the longitudinal record; (3) Dr. Greene's assertion that Klahn's illness has significantly interfered with his functioning since childhood is contradicted by evidence that he maintained a highly-skilled job for many years; and (4) Dr. Greene's Global Assessment of Functioning (GAF) ratings were inconsistent with his opinion that Klahn has evolved into a "chronic delusional state." (Tr. 34.)

Klahn does not explicitly argue that Dr. Greene's opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques (Pl's Br. at 13-16, ECF No. 9), and in his reply brief to the court, he asserts that "the only issue is whether Dr. Greene's opinion is not inconsistent with other evidence of record" (Pl's Reply Br. at 2, ECF No. 16). This position misunderstands the treating physician rule, which requires the ALJ to give controlling weight to the opinion of a claimant's treating physician *only if* (1) it is well-supported by medically acceptable

11

clinical and laboratory diagnostic techniques *and* (2) not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2) (emphasis added). Klahn's failure to address the first prong of the argument is especially significant because the ALJ did not find that Dr. Greene's opinion was well-supported by medically acceptable clinical and laboratory diagnostic techniques. To the contrary, the ALJ found that Dr. Greene's discussion of Klahn's historical inability to function in a workplace environment lacked support in the record. (Tr. 34.) The ALJ observed that Dr. Greene supported his opinion with two anecdotes: (1) in 2005, during interpersonal stress, Klahn became verbally and physically aggressive to persons in public and was arrested; and (2) in 2006, he was involved in a motor vehicle accident that was suspected but never demonstrated to be a suicide/homicide attempt. (Tr. 34, 1413.) The ALJ discounted Dr. Greene's conclusion that "workplace interactions" caused Klahn to regress to possible suicidal states and physical aggression because this inferential "leap" lacked foundation in the longitudinal record, particularly in the treating notes of Dr. Bales. In addition, he noted that the car accident cited by Dr. Greene occurred when Klahn's blood alcohol concentration was 0.20, and Dr. Greene provided no account of the role of alcohol as a causal factor in either of the cited incidents. (Tr. 34.)

Substantial evidence supports the ALJ's conclusion that Dr. Greene's opinion of Klahn's alleged deficits in social functioning lacked foundation. Dr. Greene's letter contains little factual detail about the two named incidents and Dr. Greene did not cite specific treatment notes to support his conclusions. (Tr. 1413.) In contrast, the ALJ cited treatment notes from Dr. Bales which indicated that at various times between 2005 and 2008, Klahn was doing well and that his depression was under good control with medication. (Tr. 34, 460, 607, 702.) Notably, Dr. Bales did not opine in these treatment notes that Klahn had significant deficits in social functioning, that

12

he would be unable to succeed in a work environment, or that he was experiencing suicidal ideation. In support of Dr. Greene's opinion, Klahn only offers that Dr. Bales and Klahn's therapist, Gail Beauchamp, CSW, did not diagnose Klahn with alcoholism. (Pl's Reply Br. at 3, ECF No. 16.) This assertion is contradicted by the following treatment note entered by Ms. Beauchamp on December 1, 2006: "Veteran received a DUI in 10/06 and has participated in a court ordered alcohol assessment the results of which indicate a diagnosis of Alcohol Abuse." (Tr. 34, 650.) Ms. Beauchamp then added substance use goals and objectives to Klahn's treatment plan. (Tr. 650.) Furthermore, on October 25, 2006, Ms. Beauchamp noted that Klahn's blood alcohol level was 0.20 at the time of the accident (not the 0.02 he previously reported), and she observed that Klahn did not express suicidal, homicidal, delusional, paranoid, or obsessive thoughts. (Tr. 661.) Since Klahn cites no additional evidence that could support Dr. Greene's conclusion, the ALJ did not err in concluding that Dr. Greene's opinion was not well-supported by clinical findings in the record.

Klahn has also failed to demonstrate that Dr. Greene's opinion was not inconsistent with other substantial evidence in the record, including the treatment notes cited by the ALJ. Klahn contends that the ALJ misunderstood the nature of his bipolar disorder, citing *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008), because he ignored evidence of Klahn's varying moods, paranoia, and delusional thoughts. (Pl's Br. at 16, ECF No. 9.) In *Bauer*, the Seventh Circuit cautioned ALJs that claimants with bipolar disorder will have good and bad days, and that they should not place undue weight on "hopeful remarks" in physicians' treatment notes that fail to capture the full extent of a claimant's limitations in the workplace. 532 F.3d at 609. This case is not like *Bauer*, where the ALJ failed to credit evidence that the claimant was hospitalized several times with hallucinations, racing thoughts, thoughts of suicide, and other symptoms of bipolar disorder. *Id.*

13

at 607. Here, while Klahn expressed some symptoms of bipolar disorder, there is little evidence that he lacked ability to work during the relevant period. Klahn's physicians often qualified their findings and suggested that Klahn's symptoms minimally interfered with his functioning. For example, Klahn notes that on March 21, 2005, Dr. Bales noted delusional thoughts and reported that Klahn felt he was being watched. (Tr. 473.) But in the same treatment note, Dr. Bales also observed that Klahn was "not working, but that might do him some good." (*Id.*) Similarly, on June 14, 2006, Dr. Bales observed that Klahn was upset because his neighbors were letting their dogs run wild. (Tr. 683.) However, Dr. Bales also noted that Klahn was not markedly depressed nor exhibiting suicidal or psychotic thoughts. (*Id.*) In short, Klahn's symptoms on his bad days were not like those exhibited by the claimant in *Bauer*, and it was reasonable for the ALJ to conclude that Dr. Greene's description of Klahn's "chronic delusional state" was inconsistent with other substantial evidence in the record.

The ALJ carefully considered Dr. Greene's narrative opinion and did not err in discounting it. The ALJ reasonably found that the opinion was not well-supported by clinical findings and inconsistent with other substantial evidence, and he explained that he afforded it "little weight" in part because Dr. Greene did not have a long-term treating relationship with Klahn during the relevant period. 20 C.F.R. § 404.1527(c)(2)(i). Klahn is not entitled to remand under the treating physician rule.

## B. Credibility Determination

The ALJ found that Klahn's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but he did not fully credit Klahn's statements concerning the intensity, persistence, and functionally limiting effects of his symptoms. (Tr. 32.) Klahn

Case 1:13-cv-00165-WCG   Filed 03/04/14   Page 14 of 35   Document 17

contends that the ALJ failed to properly assess the credibility of his statements in three ways: (1) the ALJ's treatment of Klahn's daily activities does not support the RFC determination; (2) the ALJ failed to consider evidence contrary to his finding that Klahn's back pain and bipolar disorder were stable; and (3) the ALJ failed to consider the side effects of Klahn's medications. (Pl's Br. at 16-20, ECF No. 9.)

In evaluating a claimant's subjective complaints, the ALJ must determine whether the claimant has established a medially determinable impairment which could reasonably be expected to produce the pain or other symptoms alleged. *See* 20 C.F.R. § 404.1529(b). If step one is satisfied, the ALJ must then evaluate the credibility of the claimant's subjective symptoms as to the intensity, persistence, and functionally limiting effects. *See id.* § 404.1529(c)(1). In doing so, the ALJ considers all the available evidence, including the following factors: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures other than treatment used to relieve pain or other symptoms; and (7) any other factors concerning functional limitations and restrictions due to pain or other symptoms. *See id.* § 404.1529(c)(3); S.S.R. 96-7p, 1996 WL 374186, at *2-3. An individual's statements about the intensity or persistence of his or her symptoms may not be disregarded solely because they are not substantiated by objective medical evidence. S.S.R. 96-7p at *1. A court's review of a credibility determination is "extremely deferential," *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013), and a court will reverse the ALJ's determination only if it is

Case 1:13-cv-00165-WCG   Filed 03/04/14   Page 15 of 35   Document 17

"so lacking in explanation or support that it is patently wrong," *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009).

The ALJ found that Klahn's "activities of daily living were indicative of greater functionality" than Klahn alleged and that "inconsistencies" diminished his credibility. (Tr. 33.) Klahn contends that "there is no logical bridge showing how these activities impact his ability to perform work or his credibility." (Pl's Br. at 17, ECF No. 9.) An ALJ may discount a claimant's credibility if he finds that the claimant's self-reported limitations are inconsistent with evidence of the claimant's daily activities. *See Simila v. Astrue*, 573 F.3d 503, 517-18 (7th Cir. 2009) (affirming ALJ's finding that claimant overstated his symptoms based on evidence that claimant helped a friend peel logs and build a log home, replaced a gas tank, attended his son's traveling hockey team tournaments, and went hunting and fishing). Such inconsistencies suggest that a claimant's testimony regarding his symptoms may be exaggerated.

Here, the ALJ considered Klahn's subjective reports of his limitations as expressed in his 2011 function report, 2011 testimony, and 2012 testimony. The ALJ noted that in the 2011 function report, Klahn estimated that he was able to sit for one or two hours without a break, stand for a half-hour without a break, and walk for a few minutes without a break. (Tr. 33, 349.) Klahn also estimated that on a given day, he could sit for five or more hours, stand one or more, and walk thirty minutes or more in an eight-hour day. (*Id*.) The ALJ then recounted that at the September 2011 hearing, Klahn estimated that the longest he could stand or sit in an eight hour day would be two or three hours, and he was not sure he could do any more than that for five days in a row. (Tr. 30.) Klahn also reported that he would need to get up and move around and "snap things back into place." (*Id.*) Klahn testified he lived alone and could drive a car, make basic meals, and do his

16

laundry at his own pace. (Tr. 31.) He reported that he was doing a "fair" job tending to his own needs, but that he was disabled because of his inability to sustain work related activities for eight hours per day, five days per week. (*Id.*)

The ALJ found Klahn's self-reported limitations to be inconsistent with his self-reported daily activities. He observed that although Klahn "alleged significant limitations in his tolerance for sitting, standing, and walking," he "was independent in all personal care tasks, did all of the household cleaning, did his own laundry, and drove a car." (Tr. 33) (citing Klahn's January 31, 2011 function report (Tr. 341) and his September 2011 testimony.) Citing Klahn's 2012 testimony, the ALJ observed that Klahn "continues to live by himself in a house. He cooks, cleans, dusts, and does laundry, but it takes him a long time and [sic] never feels caught up. He tries to do small tasks each day." (Tr. 32.) The ALJ also noted that this confirmed Klahn continued to live independently and manage household responsibilities. (Tr. 33.)

Klahn contends that the ALJ erred by using his ability to perform routine daily activities to undermine his credibility. The Seventh Circuit has cautioned ALJs against "placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362-63 (7th Cir. 2006); *see also Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating of household work to work in the labor market cannot stand."). Here, however, the ALJ did not equate Klahn's ability to perform household chores with an ability to work full-time; the ALJ did not even assess Klahn's self-reported limitations and daily activities during the time period between Klahn's onset date and his date last insured. Instead, the ALJ used his reported activities to assess his credibility. The ALJ found that the credibility of Klahn's allegations of disability was diminished because his

17

own reports were inconsistent. In other words, the ALJ found that a person who claims to be able to stand only one or more hours in a given day and walk for only a few minutes without a break could not perform the daily household activities Klahn described without assistance.

This court must afford a substantial amount of deference to the ALJ's credibility determination, and in accordance with the standard of review discussed above, the court cannot say that the ALJ's findings were unreasonable. The ALJ's description of Klahn's daily activities lacked some degree of specificity, but the ALJ took into account Klahn's qualifying statements that it took him a long time to complete household tasks and that he never felt caught up. (Tr. 32.) Despite these qualifying statements, the ALJ still found that Klahn's alleged limitations were inconsistent with his reported daily activities. This court's job is to determine whether the ALJ's findings are supported by substantial evidence and not to "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The ALJ's daily activities analysis therefore did not constitute error.

This is especially true when one considers the additional evidence of Klahn's activities that was not cited in the ALJ's decision, notably, the frequent explanations noted in his chiropractor's records explaining how he aggravated his back pain which included hiking, gardening, cutting and carrying firewood, shoveling snow, digging a trench and even roofing. The fact that the ALJ failed to explicitly cite this evidence in his decision should not bar the court from considering it. While it would violate the principles governing judicial review of administrative determinations to uphold the Commissioner's decision on grounds not considered by the ALJ, *SEC v. Chenery Corp*, 318 U.S. 80, 93-95 (1943), this does not mean that the reviewing court may not consider evidence not

18

explicitly cited to support findings the ALJ explicitly made. The question before a court reviewing the Commissioner's denial of DIB is whether there is substantial evidence in the record that supports the Commissioner's decision, not whether the ALJ explicitly cited each item of evidence. 42 U.S.C. § 405(g). If the rule were otherwise, there would be no need for the court to even review the administrative record. It would be enough to review the ALJ's decision by itself and refer to the record only when the parties disputed whether the ALJ had accurately recounted the evidence. Judicial review of administrative decisions is more than cite checking. Considering the entire record, the ALJ's conclusion that Klahn was exaggerating the intensity, persistence, and limiting effects of his impairments was reasonable and provided a logical basis for discounting the credibility of his testimony.

The ALJ also found a lack of correlation between the alleged symptoms and the treatment modalities demonstrated by the record, and noted that "[a]t various times between January 2004 and March 2009 the claimant reports feeling better, indicates he has had success with chiropractic adjustment, describes being in a good mood, states he has no paranoia, and generally confirms his overall health." (Tr. 32.) With respect to Klahn's back pain, the ALJ recounted that in February 2004, April Jackson, M.D., observed paraspinal tenderness and low back pain with straight leg raise tests. (Tr. 29, 437.) Dr. Jackson noted that Klahn had full muscle strength and normal gait, but she advised him to pursue physical therapy for his chronic back pain. (*Id.*) Klahn followed up with Bruce Baranski, M.D., in August 2004, stating a chief complaint of back pain. (Tr. 29, 417-19.) Dr. Baranski performed a musculoskeletal examination which did not indicate any significant impairments, and he assessed Klahn as "stable." (Tr. 32, 417.) In January 2006, Klahn's chiropractor, Brian Begres, D.C., documented muscle spasm and hypomobility, and he characterized

Klahn's impairment as "somatic dysfunction" of the thoracic, lumbar, and pelvic area. (Tr. 29, 457.) Lumbar spine X-rays in 2006 revealed mild disc space narrowing at the L4-5 vertebra and "minimal posterior displacement or retrolisthesis of the L4 vertebra upon L5, probably due to degenerative disc disease." (Tr. 29, 724.) As support for the lack of correlation between Klahn's alleged symptoms and the success of his treatment modalities, the ALJ cited Dr. Baranski's generally unremarkable findings, the fact that Klahn has managed his pain with a very conservative course of treatment (he did not wear a back brace, use a TENS unit, or undergo injection therapy), and the fact that Klahn denied being in pain or having a level of pain above a level of three on a scale of ten on August 14, 2007. (Tr. 32, 418, 590.) He also observed that Klahn reported good results from chiropractic adjustment in 2008 and continued to seek referrals for chiropractic care when his referrals expired. (Tr. 29, 611.)

Klahn contends the ALJ ignored evidence that the chiropractic care only temporarily relieved his pain and notes that he still rated his pain as a six or seven out of ten on other occasions, including August 2006 (Tr. 677) and February 2008 (Tr. 576). He also notes that he was diagnosed with "degenerative" disc disease in 2006 and argues that the ALJ failed to consider that his condition would only get worse between 2006 and his date last insured in 2009.

The fact that there were occasions when Klahn rated his back pain as a six or seven out of ten does not detract from the ALJ's credibility analysis. Given the activities he reported to his chiropractor, it is not surprising that he had that level of pain on occasion. But that's the point–his more severe pain was occasional, frequently linked to physically arduous activities, and not so chronically severe that more aggressive treatment was called for or even suggested. Even if Klahn did experience increased back pain on some occasions, he still reported that chiropractic treatment

20

had been helpful and that he wanted to continue his treatments. Based on this evidence, it was reasonable for the ALJ to conclude that Klahn was exaggerating the intensity, persistence, and limiting effects of his lower back.

The fact that degenerative disease was noted on MRI or X-ray is likewise not inconsistent with the ALJ's assessment of Klahn's credibility. The presence of degenerative disease does not by itself show functional limitation or pain. It was not unreasonable for the ALJ to place greater weight on Klahn's activity level and the lack of significant treatment over the history of the impairment in assessing his testimony concerning the intensity, persistence, and limiting effects of the symptoms. Not all degenerative conditions progress at the same rate, and Klahn retains the burden of demonstrating that prior to his date last insured, his impairments precluded full-time work. Klahn does not cite evidence to support the argument that his condition significantly deteriorated between 2006 and 2009, or that he sought more aggressive treatment during that time period. The ALJ was not required to make such assumptions.

With respect to the reported symptoms of Klahn's bipolar disorder, it is important to note that the only evidence of even the existence of symptoms–let alone the intensity, persistence, and severity of the symptoms–was Klahn himself, and most of the more severe reports occurred after his last insured date and while his claim was pending. (Tr. 314-21, 341-48, 1414, 1456, 1459.) This is not to say there are no earlier reports concerning a mental impairment. Klahn was seen by Dr. Marshal Bales, a psychiatrist with the VAMC in October 2004 when he was "court-ordered to treatment" following his arrest on a misdemeanor charge of domestic violence. (Tr. 411-12.) According to the progress notes, Klahn told Dr. Bales he had been diagnosed with depression when he was in the service and had been hospitalized at one time at Walter Reed Hospital. Based on the

symptoms Klahn reported, Dr. Bales noted "there are some hints of bipolar disorder here."  (Tr. 412.)  Klahn reported he was taking Celexa for depression which he thought had helped him some.  He also reported feelings of "doom and gloom" and claimed to have heard voices "like someone talking to him."  (*Id.*)  Based on these reports, Dr. Bales noted he seemed to have paranoia and some psychotic features, though he had never been treated with anti-psychotics.  (*Id.*)  Dr. Bales listed "Bipolar disorder with psychotic features" in his assessment and added Alprazolam for occasional anxiety and Risperdal.  He also prescribed therapy with Gail Beauchamp, a clinical social worker.

Ms. Beauchamp's notes indicate that Klahn's wife filed for divorce and he continued in therapy over the next several months.  Initially, Klahn reported depressed mood, low energy, diminished interest in almost all activity, and difficulties thinking and concentrating. (Tr. 402.)  By December 22, 2004, however, he was doing better on a lower dose of Risperdal.  He reported he was calm, not depressed, had no anxiety, and was sleeping well.  He seemed to be thinking realistically about marital issues and was optimistic about the new year.  (Tr. 396.)  On March 21, 2005, Klahn reported he was feeling down, blue and troubled over human mortality.  Dr. Bales noted he was not working but suggested work might do him some good.  (Tr. 473.)  On May 23, 2005, Klahn reported to Dr. Bales that he was "fishing a lot and enjoying it." (Tr. 472.)  He thought the "psych. meds really help," and appeared calm with no psychosis. (*Id.*)  Likewise, on September 15, 2005, Dr. Bales noted he was doing pretty well.  Klahn reported he was not depressed, had no paranoia or hallucinations, his sleep was good, he was not too anxious and did not need all three Xanax every day.  (Tr. 460.)  In February 2006, Klahn reported his depression was under good control with his medication.  (Tr. 701.)  On March 29, 2006, he reported he was doing fair.  He

Case 1:13-cv-00165-WCG   Filed 03/04/14   Page 22 of 35   Document 17

stated he was occasionally depressed but admitted this was on days when he was not taking his Celexa.  (Tr. 693.)

In September 2006 Klahn was involved in an alcohol-related automobile accident and was ordered into substance abuse counseling.  (Tr. 650, 661.)  Most of the treatment records for the balance of 2006 concern substance abuse counseling.  In April 2007, Dr. Bales notes he is continuing with his medications with benefit.  He reports only occasional anxiety and reports the Risperdal has "very much helped him" with his paranoia with no significant side effects. (Tr. 1018.) An August 2008 report indicates Klahn is "doing pretty well and comfortable with the meds."  (Tr. 991.)  He has no paranoia or hallucinations and reports he loves being alive and is enjoying his grandchild.  (*Id.*)

This evidence amply supports the ALJ's finding that Klahn's bipolar disorder was stable. Indeed, it was well controlled.  Klahn contends that even if his bipolar disorder was stable, such a finding does not indicate that he could work full-time.  Klahn first contends that the ALJ erred because a finding of stability, especially in relation to mental health, does not equate to an ability to work.  (Pl's Br. at 19, ECF No. 9.)  He cites *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000) as persuasive authority, but *Morales* is factually distinct from Klahn's case.  In *Morales*, a physician had opined that a claimant with a mental impairment was markedly limited in a number of work-related activities.  *Id.*  The ALJ rejected the physician's opinion in part because the physician also noted that the claimant was stable with medication.  *Id.*  Under the treating physician rule, the Third Circuit found that the ALJ erred because an opinion indicating marked limitations cannot be supplanted by a mere notation that the claimant is "stable."  *Id.*  Klahn's attempt to import this reasoning into the context of the ALJ's credibility determination is unpersuasive.  Here, the ALJ's

finding that Klahn's bipolar disorder was stable was based on reports showing his symptoms were well controlled. The medical record here contradicts his allegations of serious impairment, and this constitutes a sufficient ground to discount the credibility of Klahn's allegations.

Second, Klahn argues that even if his bipolar disorder was stable to some degree, the ALJ ignored evidence in the record which indicates that Klahn was not stable enough to enter the workforce due to "social issues and paranoia." (Pl's Br. at 19, ECF No. 9.) In addition to Dr. Greene's opinion that he exhibited a lack of "pro-social behavior" in 2011, Klahn cites his testimony that he has difficulties with others and that he survives by not dealing with other people. (Tr. 89, 1414). Klahn's own reports must be read in the full context of his testimony and in light of the ALJ's findings concerning his credibility. As noted by the ALJ, Klahn testified that he cannot work because he would have a hard time dealing with the competition and internal politics of the workplace. (Tr. 32, 89.) Klahn stated that if he had a job where he only had to interact with others occasionally, he did not think that his "personality or mindset" would allow him to succeed. (Tr. 32, 90.) In short, Klahn's statements about his social interactions have little value because Klahn's burden is to prove that he is *unable* to work, not that he *chooses* not to work. Many employees detest the internal politics of the workplace and would prefer not to deal with others, but that does not necessarily make them disabled. Klahn's statements could be interpreted in a number of ways, and in and of themselves, they provide little support for the argument that he was unable to work. The ALJ therefore did not err by failing to afford these statements weight in his credibility determination.

Klahn argues that the ALJ failed to consider the following evidence of paranoia in the testimony and treatment notes. (Pl's Br. at 20, ECF No. 9.) First, contrary to Klahn's assertions,

24

the ALJ actually did consider his testimony that he worried about his heart stopping, having a stroke, and other possible side effects of his medication. (Tr. 32.) The ALJ also noted that Klahn had occasionally experienced "mild psychosis" in the form of shadow visions. (Tr. 31.) In general, the rest of the reports of "paranoia" Klahn cites have not been expressly characterized as paranoia by Klahn's doctors, and there is little or no evidence distinguishing them from rational fears or concerns. In addition, some occurred after Klahn's date last insured.

For example, the cited entry containing Klahn's concern over neighbors stealing medicine from him offers the following: "[Klahn] wants to trial motrin for his pain and feels it will work, he states that his neighbor is a drug addict and breaks into his house [sic] takes his meds." (Tr. 525.) Klahn may have had such a neighbor, and there is nothing in the treatment note which indicates that the physician, Dr. Deborah Becker, viewed this as paranoia. In April 2012, Klahn expressed concern about the confidentiality of his psychotherapy sessions because "IM is a small town" and many employees might have access to the electronic records. (Tr. 1437.) The notation logged by Gregory Patterson, Ph.D., does not indicate that he believed this to be a paranoid thought, and it further notes that Klahn reported doing fairly well in recent months and that he did not feel a strong need for treatment. (*Id.*) On February 14, 2007, Dr. Becker noted that Klahn left an appointment early because he thought people were staring at him, but she offers no further comment or diagnosis. (Tr. 628.) On May 4, 2010, Dr. Naeem Ahmad noted that Klahn did not want to get his blood drawn because he feared a contaminated needle, but he also described Klahn's mental impairments as "well managed" and did not characterize the incident as paranoia. (Tr. 489.) Klahn testified in 2012 that he believes the date is incorrect, but again, that testimony could be subject to a number of interpretations and does not necessarily indicate paranoia. (Tr. 90-91.) Klahn's fear of death and

25

feelings of being watched are the only two examples cited that are characterized as paranoia by Klahn's doctors and within the relevant period, but neither doctor suggested that the paranoia would interfere with Klahn's ability to work. (Tr. 473, 671.) In fact, in addition to noting that Klahn had occasional paranoia about feeling watched, Dr. Bales also stated that Klahn was "not working, but that might do him some good." (Tr. 473.) Given this scant evidence of paranoia, the ALJ did not err in characterizing Klahn's bipolar disorder as stable, at least prior to his last insured date.

Finally, Klahn contends that the ALJ failed to consider the side effects of Klahn's medication as required by Social Security Ruling 96-7p. (Pl's Br. at 20, ECF No. 9.) Other than Klahn's testimony, which the ALJ found less than credible, however, there is little evidence that Klahn was experiencing significant side effects. Although some adjustments were made, the ALJ noted that Klahn was not experiencing side effects from his Risperdal in January 2008 (Tr. 30, 607), and as noted above, he reported significant satisfaction with Risperdal. Klahn cites a complaint in an October 2008 progress note as support for medication side effects, but the note states simply that Darvocet bothers his stomach if he takes too much. (Tr. 566.) There is no indication in the record of ongoing problems with Darvocet, and indeed, he claimed he had weaned himself off of narcotics when he first came to VAMC in 2004. (Tr. 434.) Klahn also cites problems with Lithium, but the only indication of that is in a note of a visit about a month before his date last insured when Dr. Greene was switching him to Lithium from his previous medication. (Tr. 549, 541.) There is no evidence of ongoing problems during the relevant time period. Based on this evidence, the ALJ's failure to address it does not undermine his credibility determination. The court concludes that the ALJ's credibility determination was supported by substantial evidence, and Klahn is not entitled to remand on this ground.

26

### C.  Limitations in Concentration, Persistence, or Pace

Lastly, Klahn argues that the ALJ failed to account for his limitations in concentration, persistence, or pace in his RFC determination and in the hypothetical question he posed to the VE. At step two of the sequential analysis, the ALJ found that Klahn had moderate difficulties with regard to concentration, persistence, or pace and cited evidence to support this finding.  (Tr. 27.) Citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010), Klahn contends that the ALJ was required to include this limitation in his RFC and in his hypothetical to the VE.  His failure to do so, Klahn contends, requires that the case be remanded.  *See also Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003); *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

The problem with Klahn's argument is that the finding on which he relies was not part of the ALJ's RFC determination.  It was a preliminary finding made at Steps 2 and 3 of the sequential evaluation process the SSA uses in disability cases.  At Step 2 the ALJ is required to determine whether the claimant has a medically determinable impairment, or a combination of impairments, that is severe. 20 C.F.R. § 404.1520(c).  At Step 3, the ALJ must determine whether the claimant's impairment or combination of impairments is of a severity that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d).  When the impairment to be evaluated is a mental impairment, the SSA uses a "special technique" to determine whether it is severe and meets a listing.  20 C.F.R. § 404.1520a.  To explain why the ALJ's finding that Klahn had a moderate limitation with regard to concentration, persistence, or pace is not a determination of his RFC, it is necessary to explain the SSA's special technique.

27

The special technique requires first an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings to determine whether he has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If a mental impairment is found, SSA then rates the degree of functional limitation resulting from it in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: none, mild, moderate, marked, and extreme. The degree of limitation for episodes of decomposition is rated on a four-point numerical scale: none, one or two, three, four or more. These ratings are then used to determine whether the mental impairment is severe (Step 2) and, if so, whether it meets the criteria of one of the listings for mental impairments (Step 3). If a claimant has had no episodes of decomposition and the first three functional areas are rated none or mild, the agency generally concludes that the claimant does not have a severe mental impairment. 20 C.F.R. § 404.1520a(d)(1). If a claimant's impairment meets or medically equals the criteria for one of the listed impairments, the individual is deemed disabled at step three of the SSA's sequential evaluation process. 20 C.F.R. § 404.1520(d)(2). If, however, a mental impairment is severe, but does not meet or medically equal a listed impairment, then a more particularized assessment is made of the claimant's mental RFC. 20 C.F.R. § 404.1520a(d)(3).

To document the application of the special technique, the SSA has created a form called the Psychiatric Review Technique (PRT) which is to be completed by the State agency medical or psychological consultant at the initial or reconsideration level of the administrative review process. 20 C.F.R. § 404.1520a(e)(1). At a hearing on the claim, the ALJ is required to incorporate the pertinent findings and conclusions on the PRT into his or her written decision. 20 C.F.R.

§ 404.1520a(e)(4). A second form, the Mental Residual Functional Capacity Assessment (MRFCA), is used to document the more detailed evaluation that is required when the claimant's impairment, though severe, does not meet or exceed the criteria of a listing and a mental RFC must be determined. The use of these forms is explained in the SSA's Program Operations Manual System (POMS), which is available at https://secure.ssa.gov/apps10/poms.nsf. *See* DI 24505.025 and DI 24510.060.

In this case, Dr. Esther Lefevre completed the PRT form to evaluate Klahn's mental impairments based on her review of Klahn's file. Dr. Lefevre checked the boxes to indicate Klahn had moderate limitations in two of the broad areas of functioning: maintaining social functioning and in maintaining concentration, persistence, or pace. Dr. Lefevre checked boxes showing only mild limitations in activities of daily living, and none for episodes of decomposition. (Tr. 709, 719.) Because Dr. Lefevre found moderate limitations in two of the broad functional areas, Klahn's mental impairment was deemed severe. But it was not so severe as to meet or medically equal a listing. The applicable listing for bipolar disorder is Listing 12.04, which covers Affective Disorders. To satisfy the paragraph B criteria of that listing, the claimant must have at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decomposition. 20 C.F.R. Part 404, Subpart P, App. 1, 12.04. Because Klahn's mental disorder did not meet a listing, Dr. Lefevre indicated on the PRT that an RFC assessment was necessary. (Tr. 709.)

Dr. Lefevre also completed the MRFCA form. (Tr. 893-96.) It is in the MRFCA that the medical consultant is to record the claimant's mental RFC. The first section of the MRFCA is entitled "Summary Conclusions." There the form lists twenty mental health functions grouped under four main categories: understanding and memory; sustained concentration and persistence;

29

social interaction; and adaptation. To the right of each of the mental health functions is a series of decision check-blocks that appear under the following headings: not significantly limited; moderately limited; markedly limited; no evidence of limitation in this category; and not ratable on available evidence. At the end of the form is a space under the heading "Functional Capacity Assessment" where the actual mental RFC is to be recorded in narrative form. (Tr. 364–68; POMS DI 24510.060.)

In completing the MRFCA, Dr. Lefevre checked boxes in the Summary Conclusion portion of the form indicating Klahn was moderately limited in two areas: (1) "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" and (2) "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 893-94.) All remaining functions were marked "not significantly limited." At the place in the form where the claimant's actual mental RFC is to be stated in narrative form, Dr. Lefevre wrote that Klahn's symptoms were "not markedly limiting," and that he was "capable of simple, routine work from AOD [alleged onset date] thru DLI [date last insured]. (Tr. 896.) As noted above, Dr. Lefevre's opinions were confirmed on March 8, 2011, by Dr. Pape, who wrote:

> Mentally, current ADL form seems to indicate that [Klahn] is dealing with pain and some avoidant behaviors. Old records show a hx of alcohol abuse with legal difficulties related to OWI and domestic strife. He was getting psych treatment and doing well with treatment and medication. The evidence does not show the inability to do unskilled work through his DLI and the PRTF and MRFC forms dated 9-24-10 are affirmed as written.

(Tr. 1409.)

30

Now, to return to Klahn's argument, it is true that the ALJ found "[w]ith regard to concentration, persistence, or pace, the claimant had moderate difficulties." (Tr. 27.) The ALJ based his finding on Klahn's January 31, 2011 Function Report, as opposed to the PRT completed by Dr. Lefevre, but in any event, he came to the same conclusion. What is key, however, is that this was not a finding as to Klahn's mental RFC. As the ALJ explained, "[t]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not a residual functional capacity assessment but are used to rate the severity of impairments at steps 2 and 3 of the sequential evaluation process." (Tr. 28.) In so stating, the ALJ was explicitly following the applicable regulation and ruling. *See* 20 C.F.R. § 404.1520a(d); see also SSR 96–8p, 1996 WL 374184, *4 (1996) ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.").

That the ALJ's findings with respect to the "paragraph B" criteria of a Listing are not intended as the claimant's RFC is also apparent from the significant differences between the PRT and the MRFCA forms. In the PRT, the functional areas to be considered are described in broad and disjunctive terms. Here, for example, the State consultant checked the box indicating Klahn had a moderate degree of limitation in "maintaining concentration, persistence, or pace." (Tr. 719.) Because three different functions are listed in the disjunctive, however, a check in the moderate box does not indicate whether the limitation applies to one, two, or all three functions. The worksheet

31

section of the MRFCA form, in contrast, breaks the three broad areas of mental function listed on the PRT into twenty functions grouped into four categories. (Tr. 893-94.) As the ALJ explained in his decision, "[t]he mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)." (Tr. 28.)

From the foregoing, it follows that the ALJ did not err in failing to include either in his RFC or in the hypothetical question he posed to the VE a moderate limitation to maintain concentration, persistence, or pace. The SSA's rulings and regulations make clear that the preliminary findings as to the broadly defined areas of function required at Steps 2 and 3 of the sequential evaluation process is not intended as an RFC assessment. The broad categories of function considered at those steps do not lend themselves to the detailed assessment needed to determine a claimant's mental RFC so that the remaining steps in the sequential process can be completed. It is for this reason that the MRFCA is used when a severe mental impairment is shown to exist that does not meet a listing. It is not error for the ALJ to comply with the SSA's special technique for evaluating alleged mental impairments. Indeed, it would be error not to follow the SSA's regulations and rulings. 20 C.F.R. § 402.35(b)(1); *see also Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991).

In fact, it appears that the ALJ added limitations to his RFC that exceeded those found by the State agency consultant to whom he gave the greatest weight. Had the ALJ accepted Dr. Lefevre's opinion entirely, he would not have included any mental limitations in his RFC that preclude unskilled work. As the ALJ noted, Dr. Lefevre concluded in her MRFCA that Klahn was capable of simple, routine work from his initial onset date to his date last insured. (Tr. 120, 33, 36,

896.)  As the Commissioner points out, basic work activities are by definition simple, 20 C.F.R.

§ 404.1521, and unless the ALJ finds a transferable skill, the RFC is necessarily unskilled.

20 C.F.R. § 404.1568.  Here, however, the ALJ added two limitations based on the Summary

Conclusion section of Dr. Lefevre's MRFCA.  The ALJ noted that Dr. Lefevre had identified

moderate limitations on Klahn's ability to be reliable in time and attendance and his ability to

complete a normal workday or workweek without interruption from psychologically based

symptoms or unreasonable rest periods.  (Tr. 36, 893-94.)  To account for these limitations, the ALJ

included in his RFC a condition that he could be off task "about five percent of the workday in

addition to regularly scheduled breaks."  (Tr. 28,36.)  In "an abundance of caution," the ALJ also

limited Klahn "to only occasional interaction with supervisors, co-workers, and the general public"

apparently based on his testimony that he did not care to be around other people.  (*Id.*)

Although Klahn does not challenge this aspect of the ALJ's decision, it is worth noting for

completeness that the boxes checked in the Summary Conclusions section of the MRFCA form are

not intended as mental RFC findings any more than those on the PRT form.  The instructions state

that "[t]he degree and extent of the capacity or limitation must be described in narrative format in

Section III."  POMS, DI 24510.063.  According to the POMS, "**Section I** [the Summary

Conclusions section] **is merely a worksheet** to aid in deciding the presence and degree of functional

limitations and the adequacy of documentation and **does not constitute the RFC assessment**."

POMS DI 24510.060 (bold original); *see also Smith v. Commissioner of Social Sec.*, 631 F.3d 632,

637 (3d Cir. 2010) ("Because Smith cannot rely on the worksheet component of the Mental

Residual Functional Capacity Assessment to contend that the hypothetical question was deficient,

his argument is without merit as it pertains to Dr. Tan and Dr. Graff.").

33

Even though the worksheet is not considered part of the RFC, it is also worth noting that unlike the PRT, the MRFCA does not have a box for mild limitations. In completing the worksheet section of the form, the medical consultant is instructed to check box one indicating that the claimant is "'Not Significantly Limited,' when the effects of the mental disorder do not prevent the individual from consistently and usefully performing the activity." POMS, DI 24510.063. Box two, indicating the claimant is "Moderately Limited," is to be checked "when the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." *Id.* In other words, a "moderate" limitation on the MRFCA means only that there is some limitation.

Here, the ALJ appears to have incorporated Dr. Lefevre's summary conclusions on the MRFCA in his RFC, and then, to account for them in his RFC, included a five percent off-task limitation. The ALJ also added a limitation that Dr. Lefevre had not noted even in her worksheet, namely that he would have only occasional interaction with supervisors, co-workers, and the general public. (Tr. 28, 38.) These limitations go beyond those contained in the MRFCA completed by Dr. Lefevre and affirmed by Dr. Pape. Klahn does not challenge this aspect of the RFC, and given the ALJ's findings, they do not seem unreasonable. *See Wennersten v. Colvin*, No. 12-783, 2013 WL 4821474, at *3 (W.D. Wis. Sept. 10, 2013) ("Although the [ALJ] did not explain why he chose five percent instead of two percent or six percent, that lack of precision is not a reason to reverse the decision . . . . The important point is that the administrative law judge did not find any evidence to show that plaintiff's ability to stay on task was impaired to the extent that it would keep him from working."). In any event, the ALJ did not err in failing to incorporate his preliminary finding of moderate difficulties in concentration, persistence, or pace into his RFC or the hypothetical question he posed to the VE. Substantial evidence in the form of the opinions of Dr. Lefevre and Dr. Pape,

34

along with the treatment history with Dr. Bales, supports the ALJ's finding that Klahn's mental impairment did not render him unable to perform substantial gainful activity.

### III. Conclusion

For the reasons given above, the decision of the Commissioner is affirmed.  The clerk is directed to enter judgment accordingly.

**SO ORDERED** this __4th__ day of March, 2014.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court
